(Reap. Dec. 8208)

S. SHAMASH & SONS, INC. v. UNITED STATES

Entry No. 13259.

(Decided April 7, 1953)

*John D. Rode* for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Samuel D. Spector*, special attorney), for the defendant.

FORD, Judge: The merchandise covered by the appeal listed above consists of merchandise described on the invoice as "JAPANESE SILK

FLAT CREPE, 16 Momme, Bleached, Size: 36″ x 50 yds. Grade: A & B." It was entered and appraised at 70 cents per yard. The importer contends that the proper export value of this merchandise is 80 cents per yard, while the Government insists that the proper value is that found by the appraiser.

At the trial of this case, the importer testified that he purchased the involved merchandise at the price of 70 cents per yard, and as supporting his testimony, there was admitted in evidence as exhibit 1, an offer from Maruyei Co., Inc., Osaka, Japan, to the importer herein, of the instant merchandise at a price of 70 cents per yard, but "Good Monday and Tuesday" only. This offer is dated August 14, 1950, and formed the basis for the sale and purchase of the involved merchandise, which it was agreed was exported on October 6, 1950.

Counsel for the importer contends, however, that this merchandise was not purchased in the ordinary course of trade, and that, therefore, the price paid for the instant merchandise does not represent the freely offered price when sold in the ordinary course of trade. It appears from the record that there was set up in Japan an organization known as Kodan. With reference to this organization, the witness testified as follows:

A. That organization was in 1947, in July and it was started by the Government to subsidize the various silk weavers all over Japan. It is like our Government's action here in buying up the surplus potatoes. It was from these people that I was able to obtain a cheaper price than the regular market price.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

A. These members—let me explain to you what Kodan is so that you will understand what it is. Kodan sold during the year 1950, seven times. Now they put the goods up at auction and those goods were bought subject to a bid.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

A. Yes, the highest bid got the goods. These were specific lots of goods; they weren't freely offerable in the market. These options were limited for a certain period, for a day or two, and when we made our offers and purchases we did not know whether we were going to get the goods or not; it was days later before we knew we had the goods.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. You mean to say the purchase of this particular invoice involved here was purchased from Kodan?—A. Exactly.

X Q. And it was not a purchase from Maruyei?—A. It was Maruyei representing Shamash with Kodan. Kodan could not export themselves directly and the only way they could sell is through an exporter.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

A. The purchases were not in the normal course of business. They were not bought from weavers, they were bought from a government organization through these respective companies.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. When they gave you this offer at 70 cents for two days, it is an option to buy, it is an exclusive option to buy for two days?—A. Exactly.

X Q. It is not a limitation that they didn't offer the merchandise to anybody else?—A. I am telling the Court that that particular lot that was offered to me of 95 hundred yards that was offered to me, it was offered to nobody else except me.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

R. X Q. Then how come you were able to buy Kodan goods for less money?— A. We were in a favorable position, we were the second or third largest importers of silk from Japan and we were in a better position to buy them as against many other people. We were one of the first buyers from the Government on a sealed bid basis back in 1949 when there wasn't any other importer that bought them from Kodan. I am explaining why we were in a more favorable position and Kodan would receive our bids and give us the favorable position.

For the purpose of establishing a value for this merchandise for export to the United States, counsel for the plaintiff offered in evidence a number of price lists or quotations from several reputable silk dealers in Japan. Exhibit 2 is an offer from Iwai & Co., Ltd., Osaka, under date of September 10, 1950, and received by the plaintiff herein, showing a price for silk flat crepe, bleached, 36" x 50 yards, 16 momme, of 81 cents per yard. Exhibit 3 is an offer from the same dealer under date of September 12, 1950, and received by the plaintiff, showing a price of 86½ cents per yard for 22,500 yards of "Crepe Sixteen Thirty-Six Inches Eighty Red Kanebo Make." Collective exhibit 4 is an offer from Asahi Silk Co., Ltd., of Osaka, under date of October 12, showing 16 momme silk piece goods, 36" wide, at a price of 79½ cents per yard, and under date of October 30, showing a price of 81¼ cents per yard for the same merchandise.

Collective exhibit 5 is an offer from Asahi Silk Co., Ltd., Kobe, showing a price on September 13, 1950, of 81 cents per yard and on September 20 showing a price of 81¾ cents per yard for flat crepe silk piece goods, 36" wide, 16 momme. Collective exhibit 6 is an offer from Asahi Silk Co., Ltd., Kobe, to the plaintiff herein offering flat crepe silk piece goods, 36" wide, 16 momme, at a price of 80½ cents per yard on October 4, and a price of 79½ cents per yard on October 12, 1950.

Collective exhibit 7 is an offer from Asahi Silk Co., Ltd., Kobe, showing a price of 80⅜ cents per yard for flat crepe silk piece goods, 36" wide, 16 momme, on September 27, and a price of 80½ cents per yard for the same merchandise on October 4, 1950. Collective exhibit 8 is a price list from Eisenberg & Co., Inc., Tokyo, under date of October 5, 1950, offering flat crepe silk piece goods, 16 momme, 36" wide, at a price of 76¼ cents per yard. Collective exhibit 9 is price list No. 556 from Aoki & Co., Ltd., Tokyo, under date of September 30, 1950, offering flat crepe silk piece goods, 16 momme, 36" wide, at 90 cents per yard.

Exhibit 10 is an offer from Maruyei to the plaintiff herein under date of October 3, 1950, at a price of 84 cents per yard for flat crepe,

Kanebo, all spot delivery. Collective exhibit 11 is an offer from Nanri Trading Co., Ltd., Yokohama, to the plaintiff herein, under date of September 29, 1950, for silk flat crepe, bleached, 16 momme, 36″ wide, at 81 cents per yard.

In addition to the above offers for sale, or quotations, counsel for the plaintiff offered and there were received in evidence nine affidavits which were marked collective exhibit 13, and exhibits 14 to 21, inclusive. Collective exhibit 13 is an affidavit by Victor C. Moche. Affiant states, among other things, that he has been engaged in the silk piece goods business for more than 15 years, during which time he has handled well over two million yards of habutaes, crepes, satins, twills, pongees, fujis, and georgettes. With reference to the function and operation of the Kodan, affiant states:

* * * that he is also thoroughly familiar with the formation, organization and dissolution of the official government agency known as the Textile Foreign Trade Association and popularly called Kodan; that said organization was formed to purchase and sell surplus silk piece goods; that said official agency was dissolved by a decision of the Japanese cabinet dated August 1, 1950 as per copy attached, Notice 25 Shin. No. 5877; that said dissolution was to take effect as from September 1, 1950; that thereafter said agency liquidated all its stock; that on or about October 6, 1950, said agency did not have nor did it offer for sale any flat silk crepe quality Kanebo 16 Momme bleached 36″ in width; that at no time during its existence did said agency freely offer its stocks for sale to all purchasers in the ordinary course of trade but only disposed of its stocks at certain stated times and in limited quantities; that announcements of sales were frequently cancelled and withdrawn; that the goods were offered either on a contract basis or a sealed bid basis; that applications for purchase had to be received on certain dates; that the right to inspect the goods was conditional on the agreement of the party desiring same to pay all expenses; that the said agency reserved the right to suspend sales partly or entirely on its own accord; that where the terms provided for sealed bids, said bids had to be received at a certain time and place and the bidder had to pay in as a guaranty more than 10 percent of his bid; that if the amount bid proved unsatisfactory when opened and did not reach the value estimated by said Agency to be correct then the Agency made no sale and that said Agency did not guaranty the quality of such goods but sold on an "as is" and "where is" basis without any warranties whatsoever.

A number of said affidavits contain the following statement, or a statement very similar thereto:

* * * that on or about October 6, 1950 the market value or the price at which such or similar flat silk crepe first quality Kanebo 16 Momme bleached 36″ in width was freely offered for sale to all purchasers in Tokyo in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States, including the cost of all containers and coverings and all costs, charges and expenses incident to placing the goods in condition packed ready for shipment was approximately 80 cents per yard; * * * and that the price for home consumption in Japan was the same; * * *.

Exhibits 14, 15, 17, 20, and 21 contain, among other things, the following:

\* \* \* that on or about said date [meaning October 6, 1950] his firm freely offered such or similar goods at a price of 80 cents per yard; and that the market value or the price for home consumption in Japan was no different.

Counsel for the defendant offered and there was received in evidence as collective exhibit A, a list of all the purchases made by the plaintiff herein from January 13, 1950, to the end of the year, showing the purchase order number, supplier, date of purchase, yardage, description of the merchandise, and the price paid. Although not so stated, this list was evidently intended to cover only entries cleared through the port of New York. Taking the sales represented by this list between September 15 and November 15, 1950, it shows only one sale on September 15, 1950, of 27,300 yards of 16-momme flat crepe, 36″ wide, at 70 cents per yard. As a matter of fact, this list shows only one other sale between July 20, 1950, and the end of the year, of 16-momme flat crepe, 36″ in width, which was on August 15, 1950, and covered 9,500 yards at 70 cents per yard. This latter sale is the merchandise here involved.

On motion of counsel for the defendant, the invoice in this case was deemed admitted in evidence as exhibit B without physically marking it. This invoice shows the transfer from Maruyei Co., Inc., to S. Shamash & Sons Inc., of only 9,400 yards, instead of 9,500 yards, as shown by collective exhibit A, of Japanese silk flat crepe, 16 momme, bleached, 36″ x 50″ yards, at a total price or value of $6,580.

Witness Weitner testified for the plaintiff that he was traffic manager and a director of Pongees Corp., importer and distributor of silk piece goods from Japan; that he was familiar with the purchases made by his company and with the offers or market reports received by said company in the ordinary course of trade. He testified that on or about September and October 1950, his company received from Japan in the ordinary course of trade quotations on Japanese flat silk crepe, 16 momme, 36″ wide, bleached, at 85.7 cents per yard. The witness testified on cross-examination that during the early part of October 1950, his company bought 16-momme, 36″ wide, flat crepe for between 80 and 85 cents per yard, and that 16-momme, 36″ wide, flat crepe is an ordinary, common commodity in the silk field.

Defendant's witness Otten testified that he was connected with Siber Hegner & Co., Inc., and that pursuant to the price list, exhibit C, he offered 16-momme, 36″ wide, flat silk crepe to the trade in the United States. On cross-examination, this witness testified that he did not know to whom such a sale was made, nor did he know the price at which the sale was made. He admitted, however, that the price at which this merchandise was sold would be the result of bargaining, or a negotiated price.

Through this witness, counsel for the defendant offered and there was admitted in evidence as exhibit C a paper which the witness referred to as "* * * nominal quotations to indicate the market value of the various fabrics listed on this quotation list." With reference to exhibit C, the witness testified as follows:

Q. And that shows an article of 16 momme flat crepe 36" silk, does that price list designate the price at which you normally offered it in the United States?— A. Yes.

Exhibit C shows an offer of flat silk crepe, 36" wide, bleached, 16 momme, at 73½ cents per yard.

Through the same witness, counsel for the defendant offered and there was received in evidence collective exhibit D, a confirmation of sale, contract 0629 under date of October 26, contract 0637 under date of October 30, and contract 0630 under date of October 31, 1950, of 10,000 yards, 27,500 yards, and 11,500 yards, respectively, of "Japanese Pure Silk Flat Crepe, 16 momme, 40", Bleached." These three transactions appear to have been consummated between Siber Hegner & Co., Inc., and Oakwood Textiles, Inc., 1412 Broadway, New York 18, N. Y. These three confirmations were signed "SIBER HEGNER & CO., INC." It will be noted that Siber Hegner & Co., Inc., is located at 183 Madison Avenue, New York 16, N. Y., and the letter of credit covering these three transactions was opened in favor of Siber Hegner & Co., Ltd., Tokyo, Japan.

In addition to the evidence heretofore set out, witness Shamash testified that he purchased 27,300 yards of 16-momme, flat crepe, 36" wide, covered by order No. 2206 on defendant's collective exhibit A, at 70 cents per yard. A copy of the invoice and warehouse entry covering this purchase is in evidence as collective exhibit 12. The witness stated that this shipment had been appraised at 86⅜ cents per yard, although he paid only 70 cents per yard, and that the merchandise was the same as that involved in this case. The witness also explained that a piece of flat silk crepe whether or not it was owned by Kodan at one time could be identical to one not so owned, since it might have been woven by the same weaver.

Based upon the record hereinbefore set out, counsel for the plaintiff contends that the correct export value of the involved merchandise is 80 cents per yard, while counsel for the defendant insists that the appraised value is the correct export value.

Counsel for the defendant contends that because the nine affidavits, exhibits 13 to 21, inclusive, are couched in similar language, that this seriously impairs the good faith of the affiants. I am not able to agree with this contention when there is no evidence in the record to indicate that the statements contained in said affidavits are not true and correct.

At the beginning of the trial of this case, counsel for defendant moved to dismiss this appeal upon the ground that there is no issue before this court, that the appraised value is the same as the entered value, and since this is true, the court does not acquire jurisdiction to hear and determine this appeal. This motion was repeated at the close of plaintiff's case, and in both instances was denied by the trial court. Since counsel for defendant does not mention this motion in its brief filed herein, the same will be considered as abandoned. In any event, the motion is without merit, and the original decisions of the court denying the same are adhered to. *Harry Glassberg* v. *United States*, 5 Cust. Ct. 599, Reap. Dec. 5048, and *H. S. Dorf* v. *United States*, 70 Treas. Dec. 1228, Reap. Dec. 3925.

Counsel for the defendant in its brief filed herein calls attention to the fact that not one sale is attached to any of the offers represented by exhibits 2 to 11 and 13 to 21, and points to collective exhibit A, which is a list of all of the purchases made by the importer during the year 1950, listing two actual sales of such merchandise, the one here involved, and another dated September 15, 1950, and insists that:

* * * Actual sales having been made in the ordinary course of trade, and containing all of the elements of export value, take precedence over offers of sale.

Although the statute, section 402, makes no mention of actual sales, but refers specifically to "offers for sale," I am frank to admit that all things being equal, I would be inclined to attach more weight to actual sales than to mere offers for sale. However, I am not unmindful of the fact that offers for sale have been held to be substantial evidence of the value of imported merchandise. *Blumenthal & Co.* v. *United States*, 12 Ct. Cust. Appls. 176, T. D. 40166.

In the instant case, however, I am of opinion that the two actual sales of silk crepe, such as or similar to that here involved, set out in collective exhibit A, do not meet the requirements of section 402 of the Tariff Act of 1930, in that the merchandise covered thereby was not freely offered for sale in the ordinary course of trade. As shown by the evidence, the two sales referred to in collective exhibit A were consummated as a result of negotiations with Kodan, a Government agency. Kodan sold to the highest bidder, provided only that Kodan considered the bid to be sufficiently high; otherwise, the bid was refused, and the merchandise was not sold at all. I am unable to see how, under any circumstances, such an offer, or sale, if one were made, could be considered a free offer or sale in the ordinary course of trade.

Evidence as to the price at which 16-momme crepe silk, 40" wide, was offered or sold, is no evidence of the price at which 16-momme crepe silk, 36" wide, was offered or sold. This is particularly true since the defendant's evidence shows that the 16-momme crepe silk,

40″ wide, is more valuable and as a rule sells at a higher price than the 16-momme flat crepe silk, bleached, 36″ wide. In finding a value for imported merchandise, this court is not permitted to add to or subtract from the price at which different merchandise is freely offered for sale or sold, and thereby calculate a value for the imported merchandise.

Exhibits 13 to 21, inclusive, with the exception of exhibits 16 and 18, in stating the price at which the merchandise is freely offered for sale to all purchasers in the usual wholesale quantities, in the principal markets and in the ordinary course of trade, use the word "approximately" 80 cents per yard, etc. I am in agreement with counsel for the defendant that the use of the word "approximately" is too indefinite, and, therefore, little weight can be given to this statement in these affidavits. However, exhibit 16 states a definite price of 80 cents per yard at which the merchandise was freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade, while exhibit 18 gives a price of between 79 and 80 cents per yard. In considering these affidavits, I have given no weight to any conclusory statements contained therein. *Brooks Paper Company* v. *United States, infra.*

As heretofore set out, exhibits 14, 15, 17, 20, and 21 state definitely that on or about the date of exportation of the involved merchandise affiant's firm freely offered such or similar merchandise at a price of 80 cents per yard, and that the market value or the price for home consumption was not higher. Such an offer would require the seller to fill an order for 1 yard of such silk at 80 cents per yard, or to fill an order for 5,000, 10,000, or 20,000 yards or more, at the same price. This fact establishes that the price of the merchandise did not vary according to the quantity purchased, and eliminates from consideration in this case the question of the usual wholesale quantity. In *Jenkins Bros.* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093, the Court of Customs and Patent Appeals held that:

> Of course, where the price at which an article is sold does not vary according to quantities sold, no question of usual wholesale quantity can arise, and in such case a single article may sometimes be regarded as a usual wholesale quantity.

While the affidavits, exhibits 14, 15, 17, 20, and 21, do not state in specific words that the price at which the involved merchandise was freely offered for sale did not vary according to the quantities sold, the fact that the merchandise was freely offered at a specific price of 80 cents per yard, or more, without any limitation as to the quantity sold or offered for sale, is convincing evidence that the price did not vary according to the quantity sold, or offered for sale. If it were otherwise, the said offers would have had to contain a variance in prices, depending upon the quantities offered for sale or sold.

The exporter in this case was Maruyei Co., Inc., and the said affidavits were executed by five different people located throughout Japan, some as employees of long standing with reputable firms of Japan, dealing in silk piece goods, and others who are managers or managing directors of such firms. This fact alone distinguishes this case from the *Brooks Paper Company* case, 40 C. C. P. A. (Customs) 38, C. A. D. 495, and *United States* v. *Fisher Scientific Company*, suit No. 4740, decided by the Court of Customs and Patent Appeals on February 6, 1953. In the two above cases, the affidavits there involved were executed by the individual exporter, and there were no supporting offers for sale from any one. In the instant case, the statement in the affidavits, exhibits 14, 15, 17, 20, and 21, "* * * that on or about said date his firm freely offered such or similar goods at a price of 80 cents per yard; * * *" finds support in the 10 free offers for sale, designated herein as exhibits 2 to 11, inclusive. This is another fact which distinguishes this case from the *Brooks Paper Company* and *Fisher Scientific Company* cases, *supra*.

Counsel for the defendant contends that one of the elements which the plaintiff must establish in this case is "the usual wholesale quantities," and insists that there is no competent proof as to the usual wholesale quantity of the merchandise involved in this case, and, as supporting its position, quotes the following from the *Brooks* case, *supra:*

To sustain his burden of proof, and overcome this statutory presumption, it is incumbent upon appellant, the party challenging the value found by the appraiser in the first instance, to prove the action of the appraiser was erroneous and to establish some other dutiable value as the proper one. To do this, that party must meet every material issue involved in the case, and if he fails to do so the value fixed by the appraiser remains in full force and effect.

The above quotation appears to be a correct statement of the law as established by the decisions of the Court of Customs and Patent Appeals and this court over a number of years. It will be noted from the above quotation that the burden of appellant is not extended beyond meeting every *material* issue involved in the case. But, if the price at which merchandise is freely offered for sale does not vary with the quantity purchased, no question of a usual wholesale quantity can arise. In such a case, the question of the usual wholesale quantity is not one of the *material* issues in the case.

Immediately following the above quotation from the *Brooks* case, *supra*, the Court of Customs and Patent Appeals made the following observation:

* * * It is clear, from a reading of section 402 (c) and (d), *supra*, that in order to prove foreign value or export value as a basis for a valid reappraisement, *the appellant must establish, inter alia, the usual wholesale quantities*, in which such or similar merchandise involved was freely offered for sale to all purchasers in the principal markets of the country from which exported, etc.

The above holding by the Court of Customs and Patent Appeals must, of course, be considered in the light of its previous holding in the same case that the appellant must meet every *material* issue in the case, and also in the light of the holding in the *Jenkins* case, *supra*, that where the price at which an article is sold does not vary according to the quantities purchased, no question of usual wholesale quantity can arise. Considering the decision in the *Brooks* case, *supra*, in the light of the fact that the merchandise involved in this case did not vary according to the quantity sold, or offered for sale, it is my view that the question of the usual wholesale quantity is not one of the material issues in this case which the plaintiff had to establish in order to prevail.

The evidence in this case as to the price at which the involved merchandise was freely offered for sale for exportation to the United States, within the meaning of section 402 (d) of the Tariff Act of 1930, shows that said price varied from 73½ cents per yard to 90 cents per yard. In *United States v. Mexican Products Co.*, 28 C. C. P. A. (Customs) 80, C. A. D. 129, the Court of Customs and Patent Appeals held that:

> In determining foreign and export values, as defined in section 402 (c) and (d), respectively, it is proper to consider only the market values or prices at which merchandise like or similar to that imported is freely offered for sale *to all purchasers* (not to the greater number, or to those of a particular class) in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade.

The weight of the evidence establishes that the price, at or about the date of exportation of the involved merchandise to the United States, at which such or similar merchandise was freely offered for sale *to all purchasers* in the principal markets of the country from which exported, in the ordinary course of trade, for exportation to the United States, including all costs, charges, and expense specified in said section 402 (d), was 90 cents per yard, packed, and that the foreign value was not higher.

For the reasons stated and following the authorities cited, I hold the proper export value of the merchandise involved in this appeal to be as set out above. Judgment will be rendered accordingly.